AO 91 (Rev. 11/11)  Criminal Complaint

FILED
United States District Court
Albuquerque, New Mexico

Erik Paltrow
Clerk of Court

# UNITED STATES DISTRICT COURT
for the
District of New Mexico

| United States of America | ) | |
|---|---|---|
| v. | ) | |
| | ) | Case No. |
| Alfred Josiah Castro<br>Year of Birth: 2007 | ) | **26-MJ-2716** |
| | ) | |
| | ) | |
| | ) | |
| *Defendant(s)* | | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of ___May 16, 2026___ in the county of ___San Juan___ in the ___ District of ___New Mexico___, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§ 1153 and 1111 | Second Degree Murder |
| 18 U.S.C. § 924(c)(1)(A)(iii) | Using and Carrying a Firearm During and in Relation to a Crime of Violence, and Possessing a Firearm in Furtherance of Such Crime; Discharging Said Firearm |

This criminal complaint is based on these facts:

Please see attached affidavit.

☑ Continued on the attached sheet.

*Claire Chadwick*
*Complainant's signature*

Claire Chadwick, FBI Special Agent
*Printed name and title*

Electronically Submitted and Telephonically Sworn.

Date: ___06/01/2026___

*Laura Fashing*
*Judge's signature*

City and state:  ___Albuquerque, NM___

**Laura Fashing, United States Magistrate Judge**
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

vs.

**ALFRED JOSIAH CASTRO**,
Year of birth: 2007.

Case No. _____

AFFIDAVIT IN SUPPORT OF
CRIMINAL COMPLAINT AND
ARREST WARRANT

## AFFIDAVIT IN SUPPORT OF COMPLAINT

I, Claire Chadwick, being first duly sworn, hereby depose and state as follows:

## I. AGENT BACKGROUND

1. I am a Special Agent with the Federal Bureau of Investigation ("FBI"). I have been employed with the FBI since 2022. I am an investigator and law enforcement officer within the meaning of Section 2510(7) of Title 18, United States Code, that is, an officer of the United States who is empowered by law to conduct investigations, to execute search warrants, and to make arrests for offenses against federal law. I am assigned to the FBI Farmington Resident Agency (RA), Albuquerque Division, where my duties include investigating violations of federal law, including crimes that occur in Indian Country.

2. I have received training and gained experience in the investigation and enforcement of major crimes including murder, firearms offenses, and other federal crimes. Additionally, I have received training and experience in interview techniques, arrest procedures, search warrant applications, the execution of searches and seizures, and various other criminal laws and procedures. I have previously participated in investigations within Indian Country involving the same crimes as enumerated below.

3.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, law enforcement officers, and witnesses. Because this affidavit is submitted for the limited purpose of securing a criminal complaint, I have not included every fact known to me concerning the investigation. I have set forth only those facts that I believe are necessary to establish that there is probable cause to support a criminal complaint, as explained below.

4.      This affidavit is being submitted in support of a criminal complaint charging Alfred Josiah CASTRO (CASTRO), YOB 2007, with violating 18 U.S.C. §§ 1153 and 1111, Second Degree Murder, and 18 U.S.C. §§ 924(c)(1)(A)(iii), Using and Carrying a Firearm During and in Relation to a Crime of Violence, and Possessing a Firearm in Furtherance of Such Crime; Discharging Said Firearm.

## II.      RELEVANT STATUTES

5.      In relevant part, 18 U.S.C. § 1153(a) states: states:

Any Indian who commits against the person or property of another Indian or other person any of the following offenses, namely, assault, manslaughter, . . . murder under section 1111 . . . shall be subject to the same law and penalties as all other persons committing any of the above offenses, within the exclusive jurisdiction of the United States.

6.      Title 18, Section 1111 defines second degree murder as the unlawful killing of a human being with malice aforethought.

7.      Title 18, Section 924(c)(1)(A)(iii) prohibits knowingly using and carrying a firearm, during and in relation to a crime of violence for which the defendant may be prosecuted in a court of the United States, in this case, second degree murder, and

possessing and discharging the weapon in furtherance of the crime as charged in this complaint.

### III.    EXECUTIVE SUMMARY OF THE MURDER

8.    On Saturday, May 16, 2026, investigators responded to the homicide of JOHN DOE, YOB 1993, in Nageezi, New Mexico, an area within the exterior boundaries of the Navajo Nation. Based on the investigation, including witness interviews, Alfred Josiah CASTRO (aka "A.J.") shot JOHN DOE in the groin causing his death. The dispute that led to JOHN DOE's murder started earlier on May 16, 2026, when CASTRO's brother (Markus, YOB 1987) and CASTRO's juvenile nephew (M.C., YOB 2011) had an altercation with JOHN DOE's father (H.W., YOB 1970). During that dispute, M.C. threatened H.W., and Markus hit H.W. This occurred at JOHN DOE's aunt's house, located approximately 400 feet away from the murder scene.

9.    During the course of these events, M.C. called CASTRO on the telephone to request that he join the fight. At that time, CASTRO was at a party in Farmington with his girlfriend. CASTRO agreed, drove to Nageezi in his white F-150 pickup truck, joined the fracas, and ultimately shot and killed JOHN DOE.



*Diagram of the parties involved*

10.    After the sounds of the gunshots, a neighbor witnessed CASTRO, Markus, and M.C. fleeing the scene of JOHN DOE's murder on foot. The neighbor also heard them laughing as they ran away. CASTRO then fled the scene in his pickup truck.

11.    CASTRO later confessed to his girlfriend (YOB 2008) that he shot JOHN DOE because JOHN DOE had a rifle. Investigators located no rifle on or near JOHN DOE to corroborate CASTRO's account. In a later statement to law enforcement, CASTRO admitted to being at Markus's neighboring home, but claimed he was inside Markus's house when the gunshots occurred. CASTRO also claimed that Markus and M.C. were in the neighboring house as well at the time of the shooting.

12.    CASTRO also changed out his license plate on his white F-150 pickup truck after the shooting. As discussed further below in Section E of this affidavit, license plate reader cameras identified the white F-150 pickup truck traveling to Nageezi, NM on May 16, 2026. On May 16, 2026, the truck was bearing New Mexico license plate WBGD73. However, on May 17, 2026, CASTRO's truck was searched by law enforcement. The New Mexico license plate WBGD73 was found inside the truck, yet the truck was bearing a different New Mexico license plate of CGZB42. Flock LPR cameras identified the truck bearing CGZB42 on May 17, 2026.

13.    When questioned as to why he switched out his license plate after the shooting, CASTRO explained his switching of plates had to do with a taillight being out.

4

14.     Navajo Nation Police Officers responded to the scene and witnessed three men running away. While receiving aid from one officer, JOHN DOE said "A.J." shot him. These were the last words JOHN DOE spoke before being declared dead.

## IV.    STATEMENT OF PROBABLE CAUSE

### A.    *Law Enforcement Arrives on Scene*

15.     On Saturday, May 16, 2026, JOHN DOE called the Navajo Nation Police Department (NNPD) to notify them about a fight involving a firearm at #137 Road 7786, Nageezi, New Mexico, which is within the exterior boundaries of Navajo Nation. JOHN DOE stated that a male named "A.J." and a male named "Markus" were fighting with JOHN DOE's father. JOHN DOE also advised that "A.J." and "Markus" were threatening to shoot him and his father.

16.     NNPD officers arrived soon thereafter, and one officer observed three males in hoodies running away from the #137 Road 7786 residence (JOHN DOE's residence). The officer also observed a male with a bloody face swinging a metal object. That male was later detained and identified as H.W. (VICTIM's father).

17.     Officers observed JOHN DOE, who stated he had been "shot" and pointed toward his groin area. An officer began to render aid to JOHN DOE. JOHN DOE began to moan in pain while aid was rendered. An officer asked JOHN DOE who had shot him, and JOHN DOE replied "A.J." JOHN DOE began to lose consciousness and no longer responded to officers. Emergency Medical Technicians attempted to load JOHN DOE onto a medical helicopter, however JOHN DOE died beforehand. JOHN DOE remained on scene as criminal investigators arrived. Later, the Office of the Medical Investigator's

preliminary results determined that JOHN DOE died from blood loss attributed to the gunshot wound in his groin.

18.    Investigators recovered four .40 caliber casings and one live .40 caliber round near the residence. The items were collected for evidence. No other firearms were located by law enforcement on scene.

B.    *Interview of JOHN DOE's Aunt*

19.    While officers were rendering aid to the dying JOHN DOE, a vehicle arrived at the scene. The occupant of the vehicle was identified as D.W. (YOB 1966), who investigators learned was JOHN DOE's aunt, who lived approximately 400 feet from the murder scene. D.W. provided the following information to investigators:

- D.W. lived near the residence where the altercation occurred. D.W. heard arguing and fighting. D.W. observed Markus Curley and M.C. in a fight against H.W.

-  The fight was occurring in D.W.'s yard. D.W. yelled at them to stop. D.W.'s nephew, E.W. (YOB 2010), helped to break up the fight. H.W. was taken back to H.W.'s residence by E.W., which was approximately 400 feet down the road. D.W. believed that Markus and M.C. returned to their nearby residence, about 100 feet from D.W.'s home.

- M.C. later called "A.J." to come and beat up H.W. D.W. knew that M.C. called his Uncle A.J. the night of the shooting because one of Markus's daughters (around age 11) called D.W.'s 14-year-old niece on FaceTime, and Markus's daughter told D.W.'s niece that M.C. had called A.J. to beat up H.W.

- "A.J." lived in Blanco, New Mexico. Navajo Nation Criminal Investigator Custer Bryant showed D.W. a photograph of Alfred Josiah CASTRO, and she confirmed that Alfred Josiah CASTRO was "A.J." Prior to being shown the photograph, D.W. accurately described CASTRO. D.W. is familiar with CASTRO because he frequented the area to drink alcohol.

- D.W. explained CASTRO arrived to Nageezi in his truck. CASTRO positioned his truck so that the lights were pointed toward H.W.'s residence. The truck lights kept turning on and off. D.W. believed this was done to instigate H.W.

- D.W. observed Markus, CASTRO, and M.C. breaking windows at Emory's trailer. Emory's trailer is approximately 500 feet from the scene of the shooting. Emory is D.W.'s brother, and the father of D.W.'s niece and nephew.

- D.W. heard back and forth arguing. D.W.'s 14-year-old niece told D.W. that "they" were running to H.W.'s house. JOHN DOE lived with his father, H.W.

- D.W. heard four gunshots and saw the police pulling up the road. D.W. saw the officer's headlights illuminating three individuals running from H.W.'s residence. D.W. recognized the fleeing individuals as Markus, M.C., and CASTRO. D.W. could hear them laughing while they were running away down the hill.

- D.W. saw CASTRO fleeing the area at a high rate of speed in his truck with the lights turned off.

- D.W. went to H.W.'s residence. She saw JOHN DOE lying on the ground. D.W. started talking to the officers, who were already on scene.

- D.W. did not see CASTRO again that night. D.W. told law enforcement that she had seen CASTRO with a firearm in the past. The gun was a black handgun. It is unknown if this was the same gun used in the shooting of JOHN DOE. CASTRO has acted like a "little gangster" and had even bragged about killing people in the past.

C.    *Interview with CASTRO's Girlfriend (D.B.)*

20.    On May 18, 2026, investigators interviewed D.B. (YOB 2008), who has been in a romantic relationship with CASTRO for approximately two years. D.B. provided the following information to law enforcement:

- CASTRO was with D.B. and her family at a graduation reception on Saturday night, May 16, 2026. CASTRO was with D.B. on Saturday night until CASTRO received a phone call from his nephew, M.C. CASTRO told D.B. that his nephew, M.C, had been hurt. M.C. was hurt by his dad or someone who was there, because they had been drinking. M.C. had been hit by someone wearing brass knuckles. CASTRO told D.B. he had to go out there and check on his nephew, M.C.

- CASTRO was driving a white Ford truck. CASTRO left around 10:30 p.m. CASTRO called D.B. and told D.B. that he had made it out there and that his brother, Markus, had been hurt. CASTRO sent D.B. a message on "Snap" of a picture of Markus's injuries. CASTRO told D.B. that Markus had been hit by a pole.

- CASTRO told D.B. that everyone was ok, but he did mention that someone had a gun. CASTRO did not say who had the gun.

- D.B. went to CASTRO's house on Sunday evening around 11:45 p.m., May 17, 2026. D.B. went there to check on CASTRO because he was not answering D.B.'s phone calls and text messages. D.B. also could see CASTRO's location on "Life360"[1], and D.B. noticed CASTRO's truck had been parked at the Dollar General in Bloomfield for some time.

- When D.B. got to CASTRO's residence, CASTRO told D.B. that his phone had been taken away. CASTRO told D.B. that Markus's girlfriend's cousin was killed. CASTRO also told D.B. about the conversation he had with investigators.

- D.B. stated on Saturday night, CASTRO went out to Nageezi to help M.C. and at some point, left Nageezi and went back home to Blanco to check on his mom. D.B. stated CASTRO told his mom he loved her and went back out to Nageezi. D.B. stated CASTRO did not get back home to Blanco until early morning on May 17th. D.B. stated she knew CASTRO's location because she could see his location on the Life360 app, and because D.B. spoke to CASTRO's mom on the phone.

- CASTRO told D.B. he had an altercation with JOHN DOE and another person. CASTRO told D.B. that someone came out of a house with a gun, and that the gun was a rifle. The person pointed the rifle at Markus, M.C., and CASTRO. CASTRO had a gun and took it out. CASTRO took out the gun to protect himself, M.C., and Markus. CASTRO told D.B. that he shot two warning shots at the individual.

---

[1]Through open-source research, Affiant knows that Life360 is a family-locator and safety membership app that utilizes real-time GPS tracking to connect family members.

CASTRO said the person with the rifle kept walking closer, so CASTRO shot the person in the leg.

- D.B. did not know CASTRO had a gun when he left. D.B. knew that CASTRO's family had guns.

D.    *Interview of Alfred Josiah (A.J.) Castro*

21.    On May 17, 2026, the FBI interviewed CASTRO. CASTRO was advised of his rights via FBI form FD-395, Advice of Rights prior to conducting an interview. CASTRO agreed to speak to Agents and provided the following information:

- CASTRO told FBI Agents that on the night of the shooting, he arrived at Markus's house after being called by M.C. CASTRO drove his white Ford F-150 truck to Nageezi. When CASTRO heard the gunshots, CASTRO was playing a game in Markus's residence.

- CASTRO said that both M.C. and Markus were also in Markus's house at the time of the shooting.

- CASTRO said he was telling the truth, and he denied any involvement in the shooting. CASTRO said he has fired guns before, but he does not possess a firearm.

- CASTRO sped out of the area in his truck after the shooting because he was drifting.

- CASTRO explained that the reason he changed out his license plate was due to his taillight being out.

E.      *Flock License Plate Reader Analysis*

22.     On Sunday, May 17, 2026, Bloomfield Police Department provided FBI data from their Flock LPR[2] Camera system, identifying CASTRO's white F-150 pick-up truck, bearing New Mexico license plate WBGD73, on Saturday, May 16, 2026. CASTRO's truck was observed on Flock LPR cameras as follows:

- 1:49 p.m. – Eastbound on Hwy 64 and Andrea Drive

- 1:51 p.m. – South Bound on Rd 5500, in the direction of Nageezi, New Mexico

- 3:47 p.m. – Westbound on Hwy 64 & RD 5821 towards Farmington

- 3:51 p.m. – Eastbound on Main & Browning, in the direction of D.B.'s residence

- 5:04 p.m. – Westbound on Main & Rowe, likely leaving D.B.'s residence

- 5:09 p.m. – Westbound on Main and Browning, in the direction of Bloomfield

- 9:08 p.m. – Eastbound Hwy 64 & Andrea Drive, in the direction of Bloomfield

- 9:10 p.m. – Southbound on Rd 5500, in the direction of Nageezi

- 11:42 p.m. – Northbound on Bloomfield Blvd near the Charlie Brown School

23.     According to the Navajo Nation Police Report, the initial call from JOHN DOE on May 16, 2026, occurred at approximately 9:45 p.m. This is consistent with Flock LPR data that indicated CASTRO was traveling south, which would be toward JOHN DOE's residence, at 9:10 p.m. The call from JOHN DOE occurred approximately 35 minutes after Flock LPR data noted the direction of travel of CASTRO's vehicle.

_____

[2] Affiant is aware that Flock LPR cameras are automated license plate readers that capture vehicle data, provide real-time alerts, and support law enforcement.

11

24.     As referenced above, a NNPD officer observed three fleeing males at approximately 11:06 p.m. D.W. identified one of those males as CASTRO. D.W. also witnessed CASTRO later leaving the scene in his truck. Flock LPR data noted CASTRO's truck traveling northbound at 11:42 p.m. There are 36 minutes between 11:06 p.m. and 11:42 p.m. According to Google Maps, it would take approximately 35 minutes to drive from the murder scene location in Nageezi to the Charlie Y Brown School identified by the 11:42 p.m. Flock alert.

V.     **JURISDICTION**

25.     As referenced above, the death of JOHN DOE occurred within the Navajo Reservation. Specifically, investigators determined the location to be near Global Positioning System (GPS) Coordinates: Latitude 36.272021, Longitude -107.762231, which is within the exterior boundaries of the Navajo Nation Indian Reservation, and is considered Indian Country for the purpose of federal law. The GPS coordinates are also within San Juan County in the District of New Mexico.

26.     Records state that JOHN DOE and CASTRO are enrolled members of the Navajo Nation.

VI.     **CONCLUSION**

27.     Based on the above information, I submit that there is probable cause to believe that Alfred Josiah CASTRO violated 18 U.S.C. §§ 1153 and 1111, that being Second Degree Murder, and 18 U.S.C. § 924(c)(1)(A)(iii), that being Using and Carrying a Firearm During and in Relation to a Crime of Violence, and Possessing a Firearm in Furtherance of Such Crime; Discharging Said Firearm.

28.    Therefore, I respectfully request that the Court approve the attached criminal complaint and issue an arrest warrant.

29.    This complaint was reviewed and approved by Supervisory Assistant United States Attorney (AUSA) Jack Burkhead.

_____
Claire Chadwick
Special Agent
Federal Bureau of Investigation

Electronically signed and telephonically sworn
on June 1, 2026.

_____
HONORABLE LAURA FASHING
United States Magistrate Judge

13